536 F.2d 39
 193 U.S.P.Q. 83, 1976-2 Trade Cases 60,995
 CARPA, INC., et al., Plaintiffs-Appellees-Appellants,
v.
WARD FOODS, INC., et al., Defendants Third-Party Plaintiffs
Appellants-Appellees,
v.
Bill G. MARTIN et al., Third-Party Defendants-Appellants-Appellees.
 No. 75-1206.
 United States Court of Appeals,
Fifth Circuit.
 July 28, 1976.
 
 George H. Kolb, Joe B. Harrison, Dallas, Tex., Seagal Wheatley, San Antonio, Tex., for Ward Foods, Inc., and others.
 Jack Hebdon, San Antonio, Tex., for Bill G. Martin, and others.
 Charles L. Stephens, Ft. Worth, Tex., for Bill G. Martin.
 Ralph G. Langley, William T. Armstrong, III, San Antonio, Tex., for Carpa, Inc., and others.
 Appeals from the United States District Court for the Western District of Texas.
 Before GEWIN, COLEMAN and DYER, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 This is a private Sherman Act antitrust lawsuit. It was brought by three plaintiffs: (1) franchisee Payne; (2) his solely owned shell corporation, Carpa, which succeeded to the franchise; and (3) Boone. Payne had been a close personal friend of one of the defendants, Bill Martin, for thirty years. Boone was Martin's brother-in-law. The other defendant, Ward Foods, Inc., had bought Martin's operations in 1968.
 
 
 2
 Boone and Payne, heavily indebted to Martin and his companies, got a jury verdict and treble damages for economic injuries allegedly caused by the imposition of illegal tying arrangements in connection with the operation of Zuider Zee restaurants in Austin and San Antonio. In a bifurcated, oddly conducted, seven week trial, the issue of liability was tried to a jury in morning sessions of the district court, while the matter of damages was heard by the special master in the afternoons. Upon its verdict of a Sherman Act violation, the jury assessed the damages (before trebling) as found by the Special Master, having heard no other evidence on that issue. Attorneys for the plaintiffs were awarded attorneys' fees in the sum of $202,380.
 
 
 3
 The appeal, dealing with multiple plaintiffs and defendants, concerning the operation of Zuider Zee restaurants in two Texas cities, has handed us a 72 volume trial record, a complex thicket of factual disputes, and difficult aspects of antitrust law, complicated by the unusual trial procedure.
 
 
 4
 We affirm as to liability. We hold that Boone was not entitled to recover $15,000 for lost investment. In all other respects, the judgment of the District Court is affirmed.
 
 I. THE BASIC FACTS
 
 5
 This case had its genesis in 1957 when Bill Martin opened a seafood restaurant in Fort Worth by the name of "Zuider Zee". Eventually, the facility was relocated and expanded to seat 400 people. Three similar restaurants were built in Dallas and Arlington, Texas. All four establishments, as well as the registered trademark "Zuider Zee", were owned by Zuider Zee Oyster Bar, a corporation, the sole stockholders of which were Martin and his family. Great Southwest Wholesale Fish and Oyster Company, Inc. was created by Martin in 1962 as a warehouse supplier of seafood products, primarily to furnish items of the kind and quality required by the Zuider Zee operation.
 
 
 6
 In 1965 Rodger Loter, who had been impressed by the quality and overwhelming success of the Zuider Zee restaurants, approached Martin requesting a Zuider Zee franchise for Lubbock, Texas. This was the first franchise. Two additional agreements were signed in 1966 with other parties for restaurants in Oklahoma City and Colorado Springs. In 1967 Loter secured a franchise for Amarillo, Texas. By 1967 there were thus four Zuider Zee franchises outstanding.
 
 
 7
 In early 1967 plaintiff Payne's son, Boots, asked his brother-in-law, who was Bill Martin's attorney, to aid him in securing a franchise from Martin. Boots met personally with Martin soon thereafter, but the latter refused to grant the franchise unless Boots' father joined the venture. The Paynes originally wanted a franchise for a restaurant in Tulsa, but that city was already under option to another individual. Martin informed them that there would be a restaurant available in Kansas City sometime in the indefinite future, and that San Antonio might soon be available because the individual who owned the option there had failed to exercise it. The negotiations culminated in a contract of March 29, 1967, between Zuider Zee Oyster Bar, Inc., and Calvin Payne, granting "a preferential right to obtain a Zuider Zee restaurant in San Antonio, Texas".
 
 
 8
 At the time this agreement was reached Martin had already drawn plans for the San Antonio restaurant, had begun ordering equipment, and had borrowed $100,000 to begin construction. Until the Paynes decided to accept the San Antonio site, Martin had anticipated building a restaurant there which would belong to the corporation or to its profit sharing trust. Payne secured the San Antonio option with the proviso that if he were unable to sell his pet food company on or before September 1, 1967, "for a price fairly commensurate with and representing a fair market value", he would have the right to a refund of all monies expended by him in connection with the franchise or construction of the restaurant. The option contract, in conjunction with a letter agreement of June 20, 1967, guaranteed this right and provided that if at any time prior to September 1 Payne elected to be a franchisee in San Antonio, "he shall execute a franchise agreement acceptable to both parties. . . ." The restaurant opened on July 7, 1967, but neither the formal franchise nor the lease agreement for the physical premises had been executed.
 
 
 9
 Payne testified that he signed a franchise agreement around the 1st of September of 1967, but the only agreement in the record is one executed on April 3, 1968. Sometime in 1968 Payne learned that Martin was about to sell his Zuider Zee interests to Ward Foods, Inc. To protect his franchise, and the lease on the restaurant premises, Payne executed the franchise agreement and lease on April 3, signing as president of Carpa. Carpa was Payne's solely owned shell corporation, organized on the same date, to which he transferred his restaurant assets. On April 5, 1968, the sale to Ward of Zuider Zee Oyster Bar, Great Southwest, and Martin's advertising company was reduced to written agreement and became effective April 16, 1968.
 
 
 10
 In January of 1967, Boone agreed to leave his managerial position in the cafeteria of Abilene Christian College to go to work for his brother-in-law's operation in Dallas. In June an oral agreement was reached that Boone was to receive a Zuider Zee franchise in Austin. Construction was begun about the same time, but Boone advanced no money for a franchise fee or for equipment until December. Boone's monetary backing for the operation came via a $125,000 loan from the Austin National Bank, guaranteed by Martin. The Austin restaurant opened on April 15, 1968, and the written franchise agreement was executed about the same time. No written lease agreement to the restaurant premises was ever signed.
 
 
 11
 Boone closed his restaurant on December 23, 1972 but refused to give Martin possession, which had to be obtained by court order.
 
 II. THE FRANCHISE
 
 12
 The Zuider Zee franchise agreement which constitutes the core of this antitrust action contains certain uniform clauses requiring franchisees to purchase all food, supplies, and equipment from Martin's affiliated corporation. The provisions of the agreement with which we are primarily concerned are as follows:1. FRANCHISE. Franchisor hereby grants to Franchisee an exclusive, nontransferable and personal license to use the tradename and trademark "Zuider Zee" in the operation of a restaurant at the location described in Exhibit A, . . . upon the terms and conditions herein set . . .
 
 
 13
 2. CONSTRUCTION AND EQUIPMENT. . . . All interior design and selective, decorative or aesthetic installation of partitions . . . , shelving, stations, planters, cash register stands, designs, fixtures, furnishings and equipment (new or replacement) shall be purchased, designed and/or constructed by Franchisor or its duly authorized agent. Franchisee hereby agrees that on any item, encompassed within the above, installed or acquired without the written consent of Franchisor, there will be paid to Franchisor twenty (20%) per cent of Franchisor's appraisal value which value will be determined by Franchisor reasonable and upon what the same or similar item or items would have cost Franchisor should Franchisor have been allowed to install same as required by this agreement.
 
 
 14
 5. OPERATION AND MANAGEMENT. . . . Franchisee agrees to buy all of its food products and supplementary items through Franchisor, at the same cost as all Fort Worth-Dallas area restaurants are then currently paying, from Great Southwest Wholesale Fish and Oyster Company, Inc., or its appointed food dealer or distributor. Franchisee agrees to buy all of its fixtures, furnishings and equipment from Great Southwest Wholesale Fixture Company, a division of Great Southwest Wholesale Fish and Oyster Company, Inc., or its appointed representative or dealer, at the same cost as all Fort Worth-Dallas area restaurants are then currently paying or would pay plus all freight and applicable shipping costs.
 
 
 15
 13. TRADEMARK. Franchisee acknowledges that the words "Zuider Zee" are a valid registered trademark owned by Franchisor and that Franchisor has the sole right (subject to licenses it may have granted) to use such trademark and the trade name "Zuider Zee" and that valuable good will is attached to such trademark and such trade name. Franchisee will use such trademark and such trade name only in the manner and to the extent specifically permitted by this agreement.
 
 
 16
 17. FRANCHISOR'S RIGHT TO TERMINATE. Franchisor shall have the right to terminate this agreement upon notice in writing to Franchisee . . . upon the occurrence of any of the following events:
 
 
 17
 (b) In the event Franchisee defaults in the performance of any agreement made hereunder and such default shall not be remedied to Franchisor's satisfaction upon demand.
 
 III. THE APPELLATE CONTENTIONS
 
 18
 On appeal, Martin, the original franchisor, and Ward, his successor in interest, raise the following contentions:
 
 
 19
 (1) The Zuider Zee Restaurant trademark had not the requisite economic power to support a tying arrangement;
 
 
 20
 (2) Any tying restrictions which may have existed were either inoperative prior to the signing of a franchise agreement, were not enforced, or were necessary for quality control;
 
 
 21
 (3) Defendants were entitled to accrued royalties owed by the franchisees;
 
 
 22
 (4) They were entitled to a directed verdict on any rental overcharge claimed by Carpa;
 
 
 23
 (5) Proof on behalf of Boone failed to demonstrate causation for loss of "business investment";(6) Attorneys' fees should have been awarded to the plaintiffs, not adjudged directly to their counsel;
 
 
 24
 (7) Numerous interrogatories should, or should not, have been propounded to the jury;
 
 
 25
 (8) The defendants were denied due process by the nature of the reference to the special master in that they were not permitted to have the jury hear any evidence on damages that had not been before the master; the plaintiffs were denied an opportunity to cross examine the plaintiffs' damage experts.
 
 
 26
 On the other hand, Carpa appeals the cancellation of its lease and the consequential loss of damages in futuro for alleged rental overcharges.
 
 
 27
 Moreover, all plaintiffs contest the reduction of their recovery by settlements paid them by other defendants, who thus made their peace and were dismissed from the case.
 
 
 28
 All parties seek attorneys' fees for this appeal.
 
 
 29
 We examine these contentions, but not necessarily in the order stated.
 
 
 30
 IV. DID THE FRANCHISE "TIE" VIOLATE THE SHERMAN ACT?
 
 
 31
 A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier", Northern Pacific Railway v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). To make it a Sherman violation, however, additional factors have to be present: sufficient economic power of the tying product to appreciably restrain free competition for the tied product, involving a not insubstantial amount of interstate commerce, establishes a per se violation.[1]
 
 
 32
 In describing the invidious effects which flow from such arrangements, the Supreme Court has said:
 
 
 33
 Where such conditions are successfully exacted, competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying arrangements serve hardly any purpose beyond the suppression of competition." Standard Oil Company of California v. United States, 337 U.S. 293, 305-06, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirement has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products.
 
 
 34
 Northern Pacific Railway v. United States, supra at 6, 78 S.Ct. at 518. See also United States v. Loew's, Inc., 371 U.S. at 44-45, 83 S.Ct. 97; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 605, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).
 
 
 35
 The separate products which are alleged to be the basis of the illegal agreement in this case are the "Zuider Zee" trademark as the tying item and the goods and services required to be purchased from the Martin-Ward enterprises as the tied items.
 
 
 36
 Initially, we recognize that there is some question that a trademark may serve as the tying "product" necessary to prove an illegal tie-in.[2] However, we agree with Siegel v. Chicken Delight, 9 Cir. 1971, 448 F.2d 43, 47, that it may be regarded as a tying product.
 
 
 37
 With respect to whether the goods and services were tied items, the jury found, and there was substantial evidence to support the finding, that from the inception of their dealings with Martin the plaintiffs were orally bound by supply purchase agreements similar to those formalized in the franchise agreements and that the franchise agreement itself clearly gave birth to and kept alive a tying arrangement.
 
 
 38
 On several grounds, however, defendants argue that no tie was established. We find them without merit.
 
 
 39
 First, they assert that since Payne's option contract for the franchise and his letter agreement allowed him to withdraw up until September of that year, with his money refunded, he was not forced to accept the franchise or to submit to any detrimental terms. This begs the question. Payne did not have to take a franchise at all. But if he did he had to shoulder the burdensome terms that the jury found to have been exerted from the inception of his dealings with Martin. The franchise was the sine qua non from the outset.
 
 
 40
 The burden of supplying a business justification for what otherwise would be an illegal tie rests with the party asserting the defense, Advance Bsns. Systems & Supply Co. v. SCM Corp., 4 Cir. 1969, 415 F.2d 55, 68 n. 12, cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101; Switzer Bros. v. Locklin, 7 Cir. 1961, 297 F.2d 39, 46. Such a limited defense traditionally has been allowed in tie-in cases despite the per se characterization.
 
 
 41
 Defendants say that work done and equipment ordered prior to plaintiffs' involvement are necessarily part and parcel of the franchise itself, and that the food supply requirements were necessary for quality control. First, the "package" rule of Beefy Trail, Inc. v. Beefy King International, Inc., M.D.Fla.1972, 348 F.Supp. 799, is raised. That case involved the sale to a franchisee of a completely equipped restaurant which had been in operation for more than six months. The court ruled that such a sale in isolation could not constitute a tying arrangement between the franchise and the items which had already become fixtures in the restaurant. Such an operation came in a complete, functioning package. Martin contends that since he envisioned the San Antonio facility as a company-owned enterprise, had selected a site, had already drawn plans, and had begun ordering equipment before Payne purchased his option, no tie as to those items existed. A similar argument is raised relative to Boone's Austin franchise. This enunciates only half the holding of Beefy Trail, however; and skewes the facts. Beefy Trail went on to say at 807:
 
 
 42
 Although an isolated sale of equipment located in an established restaurant does not constitute a tying arrangement, a different situation might exist under the circumstances where the franchisor by an intentional course of conduct seeks to circumvent the antitrust laws concerning tying arrangements by requiring a franchisee to purchase a restaurant and its equipment previously established . . . .
 
 
 43
 Martin's engineer testified that the same procedure was employed with respect to all franchisees. They were presented with the Zuider Zee floor plan, architectural design, and GSW purchased equipment. If they were given any control over modifications or the purchase of other equipment, they nevertheless had to pay the twenty percent surcharge on outside items. They were in a straight jacket in the construction and fitting of their restaurants. Even if Payne or Boone had executed agreements a year before the first nail was ordered, each would have been required to obtain the same items they eventually received, with the prescribed mark up in price. This is precisely the practice condemned in Beefy Trail.
 
 
 44
 Defendants further seek to justify the arrangements by maintaining that they were necessary to maintain product quality and the concomitant goodwill of the trademark. The Supreme Court has noted that this defense
 
 
 45
 fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway. The only situation, indeed, in which the protection of goodwill may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied.
 
 
 46
 Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).
 
 
 47
 " The relevant question is not whether the items are essential to the franchise, but whether it is essential to the franchise that the items be purchased from (the franchisor)", Siegel v. Chicken Delight, 448 F.2d at 49. Thus, an otherwise illegal tie will not be excused if there is some less restrictive way to insure product quality such as product specifications or reasonably granting approval of outside suppliers after testing products at the manufacturing and distribution level as was approved in Kentucky Fried Chicken Corp. v. Diversified Pkg. Corp., S.D.Fla.1974, 376 F.Supp. 1136, 1148.
 
 
 48
 Martin admitted that the purchase provisions were not intended for quality control, and that most of the items were readily subject to specification. The experts also reported that the bulk of the seafood products were classifiable by grade in the quantities which the restaurants bought. Out of the vast number of items which the franchisees had to buy from ZZOB, the only product about which there is even a de minimis question is hushpuppies.
 
 
 49
 Defendants similarly claim that any tie should be legally justifiable as necessary to aid Zuider Zee in breaking into the food franchising market. This "new industry" defense arises from General Talking Pictures Corp. v. American Tel. & Tel. Co., D.Del.1937, 18 F.Supp. 650, 666, and United States v. Jerrold Electronics Corp., E.D.Pa.1960, 187 F.Supp. 545, 556-57, aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), and was noted in Brown Shoe Co. v. United States, 370 U.S. 294, 330, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Jerrold and Talking Pictures agree, however, that once there is a competitor who can supply the tied items in the same quality class as the original vendor, the justification for a tying arrangement to protect the industry name evaporates. Only when the limited knowledge or inability of others makes specification impractical, if not impossible, will an otherwise illegal tie be excused. In effect, therefore, the "new industry" and "quality control" defenses are indistinguishable, and both fail in this case for the same reasons.
 
 
 50
 In light of the foregoing, the plaintiffs needed only to prove (1) the economic power of the Zuider Zee trademark and (2) a "not insubstantial" amount of commerce in the tied items to establish the antitrust violation and a causal connection between the violation and each type of injury alleged to establish liability for treble damages.
 
 V. ECONOMIC POWER AND AMOUNT OF COMMERCE
 
 51
 Defendants insist that the required economic power had not been demonstrated because plaintiffs could just as easily have acquired a seafood franchise from someone else or simply have opened a restaurant of a quality comparable to that of Zuider Zee. Additionally, they assert that the small number of franchises (three in operation prior to Payne's and five before Boone's) indicated that the trademark lacked coercive attractiveness, citing Capital Temporaries, Inc. of Hartford v. Olsten Corp., 2 Cir. 1974, 506 F.2d 658.
 
 
 52
 The Supreme Court has explicitly stated, however, that the general language in Times-Picayune should not be construed
 
 
 53
 as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product . . . . To give it any other construction would be wholly out of accord with the opinion's cogent analysis of the nature and baneful effects of tying arrangements and their incompatibility with the policies underlying the Sherman Act. Northern Pacific, 356 U.S. at 11, 78 S.Ct. at 521.
 
 
 54
 More recently in Fortner, 394 U.S. at 502-03, 89 S.Ct. at 1258, the Court held:
 
 
 55
 Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market.
 
 
 56
 What is required is a factual assessment of the tying product's uniqueness and desirability, not its market power in the sense of a Section 2 Sherman violation. United States v. Loew's, Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). Uniqueness, of course, presupposes that competitors are in some way foreclosed from offering the distinctive product. Fortner points out at 505, 89 S.Ct. 1252, note 2, that such barriers may be legal, as in the cases of patented or copyrighted products. Trademarks surely may be included in the list of such legal restraints, and, as with copyrighted material, the mere presence of competing substitutes is insufficient to destroy the legal, and more importantly the economic, distinctiveness of the trademark. See Loew's, 371 U.S. at 49, 83 S.Ct. 97.
 
 
 57
 Neither the Supreme Court, nor this Circuit, has gone so far as to presume that the mere existence of a trademark in and of itself supplies economic power sufficient to constitute an antitrust violation. Unlike a patent or copyright which is designed to protect the uniqueness of the product or process itself, a trademark protects only the name or symbol of the product. This is a basic conceptual difference. Thus, if we concede the uniqueness of the Zuider Zee mark, we nevertheless hold that a legally unique name alone cannot demand a presumption of economic power. In Warriner Hermetics, Inc. v. Copeland Refrigeration, 5 Cir., 1972, 463 F.2d 1002, we went only so far as to refer to the trademark of one of the nation's largest and best known refrigeration firms as "persuasive evidence of significant market leverage". We adhere to the principle applied by the Supreme Court in Fortner, supra :
 
 
 58
 (T)he proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.
 
 
 59
 394 U.S. at 504, 89 S.Ct. at 1259.
 
 
 60
 The original franchisee sought out Martin because of his desire to benefit from the goodwill and success to be obtained by the use of the unique Zuider Zee mark. The testimony and internal memoranda indicate that substantially the same was true of all the other buyers, who executed the same form agreement obligating them to buy from ZZOB at prices substantially higher than market. In the absence of another explanation, such an extensive price differential alone suggests the existence of some special economic power. Fortner, 394 U.S. at 504, 89 S.Ct. 1252; Northern Pacific, 356 U.S. at 7-8, 78 S.Ct. 514; United States v. Jerrold Electronics Corp., E.D.Pa.1960,187 F.Supp. 545, 555, aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806; Advance Bsns. Systems & Supply Co. v. SCM Corp., 4 Cir. 1969, 415 F.2d 55, 68, cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101.
 
 
 61
 When Fortner refers to "an appreciable number of buyers", it does not mean "a substantial number". Where a patterned practice exists, the intent and spirit of the antitrust laws require a holding that an appreciable number of buyers is enough. This case does not concern a small, local operation, but a corporation advertising for franchisees throughout the Southwest in the Wall Street Journal. Most telling of all is the 1967 assessment Martin caused to be prepared of his operations when he intended to sell ZZOB. The memorandum stated:
 
 
 62
 Zuider Zee is a well-managed company operating and franchising seafood restaurants. The company has exhibited tremendous growth in both sales and earnings, and management expects to continue this growth trend in the future. It has an excellent reputation for service and quality in its marketing area and has created a well-known public image by using a Dutch windmill motif in the construction of its restaurants.
 
 
 63
 In Fortner, at 501, 89 S.Ct. at 1258, we find that the requirement of a "not insubstantial amount of commerce"
 
 
 64
 is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie, for as we said in International Salt, it is "unreasonable, per se, to foreclose competitors from any substantial market" by a tying arrangement, 332 U.S. at 396, 68 S.Ct. (12), at 15.
 
 
 65
 While it does not appear that defendants even challenge the sufficiency of the evidence in this respect, we note that there was sufficient evidence in the record to show that a substantial amount of business was foreclosed to competitors by the illegal tie.
 
 
 66
 To be more specific, we hold that the existence or absence of economic power in a trademark and the presence or absence of a "not insubstantial amount of commerce," are questions of fact. In the absence of evidence about which reasonable men could not differ, they are issues for the jury. The District Court (appendix 117) instructed the jury that before they could find a violation of the law the plaintiffs must prove:
 
 
 67
 (1) that the scheme in question involved two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased;
 
 
 68
 (2) That the tying product possesses sufficient economic power appreciably to restrain competition in the tied product market; and
 
 
 69
 (3) That a "not insubstantial" amount of commerce is affected by the arrangement.
 
 
 70
 We think this charge submitted the issues in intelligible terms and that the Court fell into no error when it declined to propound special interrogatories to the jury on these points individually. The jury was told what it takes to constitute an illegal tie under the Sherman Act and the submitted interrogatory directed the jurors, if they could agree on it, to answer "yes" or "no" as to whether an illegal tying arrangement had, in fact, existed. Viewing the charge as a whole, we think the issue of the existence of an antitrust violation was fairly submitted, that there is no reason to fear that the jury misunderstood the indispensable requisites.
 
 VI. CAUSATION
 
 71
 Defendants also argue that there was insufficient evidence to show that the tie-in resulted in injury to plaintiffs because it was not enforced. They point to Boots Payne's admission that he began buying supplies from outside sources in 1968. Purchases outside ZZOB accounted for 12% of Payne's inventory in 1968, 25% in 1969, and 50% from 1970 on. Martin claims he could not have helped knowing of such purchases at the time because of his centralized bookkeeping system, but that he never attempted to penalize the Payne operation. Rodger Loter, the Amarillo franchisee, testified that he told Boots in 1968 that he was buying what he wanted outside and that Boots might do the same, and Boots admitting writing Ward in 1969 complaining about the excessive rental he was paying, but without mentioning the purchase provisions to them.
 
 
 72
 The jury was specifically instructed by the district court that only those damages that were approximately caused by the illegal arrangement could be recovered by the plaintiffs. In answers to interrogatories, the jury found that each plaintiff suffered damages as a proximate result of the arrangement, that the franchise agreement was enforced, and that neither plaintiff knew that he was permitted to purchase "all food products, supplies, equipment, furnishings and wares of every kind" from suppliers of their own choosing.
 
 
 73
 While we deal with specific items of damage, rental overcharges, and Boone's loss of investment value infra, our review of the record indicates clearly that was sufficient evidence to permit the jury to reach the conclusions that it did. It is undisputed that the equipment was, in fact, purchased and installed in each restaurant and that it was purchased from ZZOB or its designated agent pursuant to the explicit requirements of the franchise agreement. In addition, both plaintiffs made extensive purchases of supplies from defendant suppliers even though they made purchases outside. Also, Boots testified that Martin threatened him with a surcharge on an item purchased outside in 1968, and that he was warned by ZZOB employees about not buying the company's products. A descriptive memorandum which Martin had prepared by the investment banking concern of Eppler, Guerin, and Turner in connection with the proposed sale of his ZZOB properties clearly states Martin's position:
 
 
 74
 Zuider Zee's franchise arrangement is that franchised operators pay a $12,500 franchise fee and 1 per cent of gross sales. In addition, the franchisee must purchase all food, supplies, and restaurant equipment from Zuider Zee at cost plus 20 to 25 per cent. The franchisee is also required to build his restaurant according to specified plans and to purchase all his wholesale fixtures from Zuider Zee at cost plus 20 per cent.
 
 
 75
 The verdict on the causal connection between the antitrust violation and the injuries alleged was supported by substantial evidence. Accordingly, we affirm the judgment on defendants' liability.
 
 VII. ACCRUED TRADEMARK ROYALTIES
 
 76
 The Master's report found that Carpa owed the franchisor $32,021.40 in accrued royalties, and Boone owed $15,819.70. These amounts were to be allowed as offsets against the damages which plaintiffs should recover. However, in its final judgment, the Court struck the royalties owed under the franchise agreements because the agreements violated the Sherman Act. Defendants argue that even Chicken Delight did not go so far, but rather the case was remanded so that royalties could be awarded. We do not so interpret the matter. The case was returned to the district court because a portion of the overcharges claimed as damages was actually a royalty and should not have been included as a part of the damage computation. Siegel v. Chicken Delight, 448 F.2d at 52. In cases similar to the one before us, patent holders have repeatedly been denied royalties and infringement protection when the patent was employed to commit an antitrust violation. United States v. Loew's, Inc., 371 U.S. at 46, 83 S.Ct. 97; Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 401, 67 S.Ct. 416, 91 L.Ed. 374 (1947).
 
 
 77
 We see no reason for differentiating between the treatment afforded patents and trademarks. See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598-99, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). It is true that the trademark was not illegal; the collection of a royalty is not illegal; the supplies were the tied item. Nevertheless, the trademark was the linchpin of the whole arrangement. It was the factor upon which the entire illegal arrangement depended. We therefore see no error in denying the collection of royalties on its illegal use.
 
 
 78
 It is suggested that if the agreement to pay a 1% royalty on all sales was illegal the trademark owners are entitled to collect the reasonable value of the use of the trademark. Since equity aids only those who come into court with clean hands, we do not consider ourselves free to adopt this suggestion.
 
 VIII. RENTAL OVERCHARGE
 
 79
 Defendants contend they were entitled to a directed verdict on Payne/Carpa's damage claim for rental overcharges. The standards for deciding a motion for a directed verdict were articulated in Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374-75. Basically, the Court should consider all the evidence in the light most favorable to the non-moving party, granting the motion only when reasonable men could not arrive at a contrary verdict.
 
 
 80
 Martin and Ward claim to have met this standard by showing that Payne was under a month to month lease which he could have terminated, and that he executed a written lease only to protect himself from being ousted by Ward. This is the same argument raised to the tying arrangement, i. e., Payne could have "gotten out" of it, Payne was free to vacate his leasehold, but only at the price of giving up Zuider Zee. This was the essence of the illegal tying arrangement. Denial of the directed verdict was clearly proper.
 
 IX. BOONE'S LOST INVESTMENT
 
 81
 Based upon the Master's report, Boone was awarded $15,000 for the loss of his investment in his restaurant, which did not fold until two years after this suit was filed. This $15,000 was in addition to full recovery for overcharges, unnecessary equipment, and $12,000 for lost profitability. The defendants twice objected to the award on the ground that no causal connection was shown between the restaurant closing and the antitrust violations which stopped two years earlier and that the award represents a multiple recovery.
 
 
 82
 Increased cost of doing business, lost profitability until the date of a concern's demise, and lost investment value may each be awardable as antitrust damages. These items are not necessarily mutually exclusive, provided there is sufficient evidence to support each claim. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Brewer v. Uniroyal, Inc., 6 Cir. 1974, 498 F.2d 973, 978; Farmington Dowel Products Co. v. Forster Mfg. Co., 1 Cir. 1970, 421 F.2d 61, 81-82.
 
 
 83
 We articulated the standard of proof as to causation in Terrell v. Household Goods Carriers' Bureau, 5 Cir. 1974, 494 F.2d 16, 20, cert. dismissed, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260:
 
 
 84
 (T)he plaintiff need not prove that the defendant's wrongful actions were the sole proximate cause of the injuries suffered. He must show only, as a matter of fact and with a fair degree of certainty, that defendant's illegal conduct materially contributed to the injury. Once the important causal link between the actions of the defendant and the injury to the plaintiff has been established, the plaintiff may enter the more uncertain realm of evaluating the portion of the injury that may be attributed to the defendant's wrongful conduct.
 
 
 85
 Thus, it was incumbent upon Boone to show that the tying arrangements materially contributed to his investment loss. Upon discharging that burden, Boone could embark on the task of showing the amount of injury.[3]
 
 
 86
 The Jacks Report, upon which the Master premised his finding, simply concludes:
 
 
 87
 The capital loss in the Austin restaurant would be attributable to the owner's inability to sell his operation as of December 31, 1970 because historical financial statements would prevent the operation from being favorably valued by anyone desiring to purchase the business. Therefore, it is my opinion that the failure of the Austin business and the capital loss sustained was a result of the claimed overcharges, if they are established.
 
 
 88
 Granting that the overcharges may have had some effect on the desirability of Boone's restaurant in the eyes of an imaginary investor in 1970, we fail completely to see how this could have contributed to the failure of the business two years later. Boone's operating capital was not damaged by it because he owed more on his ZZOB account that he had been overcharged. What the expert did, in effect, was to assume that once the business failed, any net amount Boone would have to pay after balancing overcharges and offsets would constitute lost investment. This overlooks the necessity of showing that the antitrust violation was a material cause of the failure itself.
 
 
 89
 There is other trouble with the background material and assumptions upon which Jacks relied in the formulation of his conclusion. These items were not only employed for determining the extent of damage, but also to show its existence. Because of the lack of material to support the books of account and the inability to observe the physical inventory, the auditors declined an opinion on the historical financial statements. The pro forma financial statement included the restaurant sign as an overcharge, but the Master found the amount charged for this item to be reasonable. In addition to presuming the accuracy of both statements, Jacks assumed out any effect of poor management. The proposition is elementary that estimates and opinions may be based upon assumptions, but only so long as the assumptions rest on adequate data.[4] Here the ultimate conclusion was taken as a "given". The award is bereft of evidentiary support; it accordingly falls.
 
 X. DIRECT AWARD OF COUNSEL FEES
 
 90
 The successful plaintiff in a civil antitrust action may recover a reasonable attorney fee. 15 U.S.C. § 15. The right is accorded the injured party, not his counsel. First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas & Elec. Co., 8 Cir. 1957, 245 F.2d 630, 632. While noting that the fee recovery was plaintiffs' personal right, the judgment below enforced an agreement, the existence of which was not disputed, assigning any awarded fees directly to counsel. Defendants vigorously contest this, for obvious reasons. After applying Boone's treble damage recovery to the accounts and other judgments owed defendants, Boone will still be in the red. Ward would much prefer to flesh out its recovery from the fund to which the attorneys must look for their fees. We know of no statute or public policy denying an antitrust plaintiff the privilege enjoyed by plaintiffs in other cases, that of making an assignment to his attorneys in order to secure their services in the prosecution of his case. To deny counsel the fees awarded, and to do so at the instance of an antitrust defendant, would, we think, be inconsistent with the purpose of the statute in allowing, if not encouraging, private enforcement of the antitrust laws.
 
 XI. INTERROGATORIES
 
 91
 Defendants complain about many interrogatories which should, or should not, have been propounded to the jury. Those not already considered and rejected deal with failure to segregate the damages awarded Payne individually and those granted Carpa, his corporation, which assumed control of the San Antonio franchise in 1968 or 1969. The cases cited by defendants deal only with the inability of a stockholder to collect damages for an injury to the goodwill of a corporation. Such is not the situation before us. We are dealing with specific illegal acts which caused direct, tangible damage to an individual, and later to his wholly owned corporation. Aggregating the awards to the two, if error, was harmless.
 
 XII. DUE PROCESS
 
 92
 The contention of Martin-Ward that they were denied due process by the method utilized by the District Court for the ascertainment of damages has been a troublesome aspect of this appeal.
 
 
 93
 The Bench and Bar are well familiar with the procedure, often followed, of first trying the issue of liability and if liability is found then trying the issue of damages. This approach has the virtue of avoiding lengthy evidence and expensive proceedings on the latter issue if it should turn out that there is no liability.
 
 
 94
 Here, the question of damages was tried to a special master, simultaneously with the ongoing joust over liability. Even so, we can find nothing in the record to indicate that Martin-Ward raised any serious objection, if objection at all, to that method. On the other hand, they participated in the proceedings before the special master. It is too late in the day to complain about that.
 
 
 95
 No live testimony was presented to the special master, as we understand it, by either side. Martin-Ward now complain that they should have been allowed to cross examine those who authored the ex parte statements of account and expert opinion on other matters presented to the special master. Again, however, the record appears to be bereft of any request that these individuals be cross-examined before the special master. The major item for the determination of the special master, to be reported to the court and there subject to objection, was the amount of the heavy debts owed by Payne, Carpa and Boone to Martin-Ward. Our examination of the record indicates that these items were fairly computed.
 
 
 96
 When the report of the special master was tendered to the Court, a faint objection was expressed to only one item and that was not followed up when the Court invited it.
 
 
 97
 Martin-Ward now say, obviously with much sincerity, that the Court denied them the right to cross-examine these auditors and experts before the jury. It is certainly true, however, as we read the report, that they never filed any objections to the master's report on which cross-examination might have been predicated or its scope defined. They never made proffer of what they expected to establish by such cross-examination. They never asked to call witnesses who had not authored the evidence heard before the special master.
 
 
 98
 The report was entitled to go to the jury as prima facie evidence of what it purported to establish, but the defendants were entitled to offer evidence in rebuttal. They made no such offer.
 
 
 99
 To be more specific, defendants had several opportunities to object to the submission of the master's report. While they complained some about it, they passed up all opportunities to make specific, meaningful objections.
 
 
 100
 The argument they make here, respectfully and with considerable intensity, is that such objections would have been fruitless and could have served only to prejudicially antagonize the Trial Judge. It is apparent from the record that, justifiably or not, the patience of the Judge was sorely tried and he rather emphatically manifested that reaction. Even so, it is not to be presumed that courteous, firm insistence of counsel on making his record would have met with denial. Such an error would have been a self-inflicted wound. It never happened that way.
 
 
 101
 There was a lot of bad blood in this case, whipped up between relatives and erstwhile close friends. The defendants were at loggerheads between themselves. We do not think it unfair to say that these feelings also invaded the ranks of counsel. It was a hard case to try, both for counsel and Judge.
 
 
 102
 We think the correct prescription for this kind of situation was announced in Colonial Refrigerated Transportation, Inc. v. Mitchell, 5 Cir. 1968, 403 F.2d 541, 552:
 
 
 103
 "The purpose (of Rule 46) is to inform the trial judge of possible errors so that he may have an opportunity to reconsider his ruling and make any changes deemed advisable. It is therefore the general rule that points not raised and preserved below will not be considered on appeal. (citations omitted) Though an appellate court, in a proper case, has power, on its motion, to consider errors to which no objections were made, such power should be exercised only in exceptional cases and in the interest of justice. (citations omitted)"
 
 
 104
 This, of course, does not preclude our function in noticing plain error or avoiding injustice. We confess our reaction that this was not the better way of trying an antitrust lawsuit, but extended consideration fails to distill any feeling that plain error was committed or any abiding conviction that an injustice has been done.
 
 XIII. THE PAYNE-CARPA-BOONE APPEAL
 
 105
 The District Court cancelled the lease which bound Carpa to pay an excessive rental. This removed any obligation to pay for the remainder of the lease term. Had the agreement not been so abrogated, plaintiff would have suffered an additional $11,115 in excessive rental charges which he wishes to treble. Citing Bruce's Juices v. American Can Company, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), Carpa claims such action to be the only proper remedy under the antitrust laws. We disagree.
 
 
 106
 Bruce's Juices began as a state court action by American Can Company to collect accounts owed over a period of years for sales of goods to Bruce's. The buyer sought to impose the defense that the seller had practiced price discrimination against him contrary to the provisions of the Robinson-Patman Act, and he sought to analogize holdings under the Sherman Act to his Robinson-Patman situation. The Supreme Court replied that it had held that
 
 
 107
 where a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute. Continental Wall Paper Co. v. Louis Voight and Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486. . . . But when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit and has reaffirmed the "doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes'." D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174-175, 35 S.Ct. 398, 401, 59 L.Ed. 520; Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679.
 
 
 108
 Bruce's Juices v. American Can Co., 330 U.S. at 754-55, 67 S.Ct. at 1020.
 
 
 109
 Similarly, in Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), the Court refused to accept a collateral violation of the antitrust laws as a defense to a suit filed in federal court for debt on goods sold and delivered at a fair price. Bruce's Juices was reaffirmed.[5]
 
 
 110
 The lease, as well as the accounts receivable allowed as offsets, were sufficiently collateral to the tying arrangement to be enforceable, even though a portion of the amounts paid for the lease and the goods sold constituted antitrust damages. The purchases themselves were not illegal, only the requirement to purchase and the contractual sanctions for failure to do so were violative of the Sherman Act. Although the items involved in Kelly, supra, Response of Carolina, supra at footnote 4, and Abercrombie, supra at footnote 4, were so completely independent of the alleged antitrust violations that they were not even a basis for an antitrust recovery, we feel that the Voight rule on illegal contracts is similarly inapplicable to the case before us. Plaintiffs received tangible items from one who possessed title to the goods, and the law presumes the expectation of paying a reasonable price for them. Simply stated, one should not be able to get something for nothing. The Sherman Act provides the proper remedy of treble damages for any injury incurred in carrying out this policy.[6] Concerning Carpa's future rental, however, we are not dealing with a buyer attempting to defend a debt collection suit by seeking to avoid paying for what he has received, as in the previous cases. Instead, Carpa would enlist the Court's aid to pyramid his damages for an item to have been received in the future. We see no reason why the District Court should have aided Carpa in unnecessarily compounding its damage recovery. Cancellation of the lease afforded an adequate remedy.
 
 
 111
 Plaintiffs next appeal the offsetting of their judgment by amounts they accepted in return for covenants not to sue other suppliers originally sued as co-conspirators. They contend that they sought to prove at trial only violations inherent in direct sales by ZZOB; whereas, the settlements received related to outside suppliers designated by ZZOB, who overcharged plaintiffs or paid kickbacks to ZZOB in return for the designation. In support of their argument, plaintiffs point out that no damages were awarded for kickbacks, that the designated beer supplier was granted a directed verdict because of lack of evidence of its conspiratorial involvement, and that the burden of proof is on the party claiming release as a defense to demonstrate that a double recovery will result.
 
 
 112
 An antitrust plaintiff who recovers damages for an injury from one co-conspirator via a release may not recover for the same item from another co-conspirator. The intention of the parties to the release is the controlling factor as to just what damages are covered. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).
 
 
 113
 The District Judge, who was far more intimately acquainted with the original parties, their intentions, and the facts of this case, found that the settlements were properly deductible. For several reasons, we cannot condemn the decision. First, the settling parties were all named as co-conspirators in the various complaints, and GSW was asserted to be the central purchaser for all the restaurants, buying its supplies from the named co-conspirators. Second, as an example of an item for which double recovery might accrue if the deduction was not allowed, Hines & Smart, which supplied lobsters for the restaurants, was one of the settling parties. Yet the expert's computation on food overcharges, for which damages were awarded, included lobsters as one of the overcharge items. Finally, contrary to plaintiffs' allegation, the real basis of their quarrel with the suppliers appears to have been having to pay higher prices for lower quality goods, not rebates. This is particularly true since the rebate items were kegs of beer, and the major beer supplier was granted a directed verdict. Due to the fact that the damages proved at trial were for overcharges, and this was the only real damage alleged to have flowed from the conspiracy, we would not be warranted in disturbing the decision of the District Court.
 
 XIV. ATTORNEYS' FEES ON APPEAL
 
 114
 Successful plaintiffs in antitrust cases, where the damages are trebled, shall recover a reasonable attorney's fee, 15 U.S.C., Section 15. This authorizes an allowance for services performed in connection with appellate proceedings, Perkins v. Standard Oil Company of Cal.,1970, 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534. The amount, neither extravagant nor niggardly, but reasonable, is for the exercise of sound judicial discretion.
 
 
 115
 Plaintiffs claim $21,000 for their costs and expenses on appeal. Their attorneys were awarded $202,380 for their services in the District Court. The reasonableness of this figure is not challenged by an assignment of error on this appeal. Consequently, it is not a matter for our consideration. As to the services rendered in this Court, counsel for the plaintiffs have successfully defended the judgment below except as to the $15,000 recovered for loss of investment. They have failed at all points in their own appeal. Applying the standards applicable in such cases, we find that an attorneys' fee of $10,000 would be reasonable for the defense of the Martin-Ward appeal. The costs of the Payne, Carpa, and Boone appeal shall be assessed to them. They shall recover costs for the defense of the Martin-Ward appeal.
 
 
 116
 Except for the $15,000 awarded Boone for lost investment, the Judgment of the District Court is in all things affirmed. As to the lost investment item, the Judgment of the District Court is reversed.
 
 
 117
 The case will be remanded in order that the District Court may enter a final judgment in conformity herewith.
 
 
 118
 AFFIRMED in part. REVERSED in part. REMANDED.
 
 
 
 [1]
 Fortner Enterprises, Inc. v. United States Steel Corporation, 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Northern Pacific Railway v. United States, 356 U.S. at 6, 78 S.Ct. 514; International Salt Company v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Miller v. Granados, 5 Cir., 1976, 529 F.2d 393; Sulmeyer v. Coca Cola Company, 5 Cir., 1975, 515 F.2d 835, 844
 
 
 [2]
 Ungar v. Dunkin Donuts, 3 Cir., 1976, 531 F.2d 1211, 1215, fn. 4; Redd v. Shell Oil Co., 10 Cir., 1975, 524 F.2d 1054, 1057
 
 
 [3]
 Zenith Radio Corp. v. Hazeltine Research Corp., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264-65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. at 562, 51 S.Ct. 248; Hobart Bros. v. Malcolm T. Gilliland, Inc., 5 Cir., 1973, 471 F.2d 894, 902, cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150; Poque v. International Industries, Inc., 6 Cir., 1975, 524 F.2d 342, 345; Haverhill Gazette Co. v. Union Leader Corp., 1 Cir., 1964, 333 F.2d 798, 806, cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343; Flintkote Co. v. Lysfjord, 9 Cir., 1957, 246 F.2d 368, 392, cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46
 
 
 [4]
 Copper Liquor, Inc. v. Adolph Coors Co., 5 Cir., 1975, 509 F.2d 758, 759; Lehrman v. Gulf Oil Corp., 5 Cir., 1974, 500 F.2d 659, 667, cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); Terrell v. Household Goods Carriers' Bur., 494 F.2d at 24; Farmington Dowel Products Co. v. Forster Mfg. Co., 1 Cir., 1970, 421 F.2d 61, 81-82; Flintkote Co. v. Lysfjord, 246 F.2d at 390-94
 
 
 [5]
 See also Abercrombie v.Lums, Inc., 5 Cir. 1976, 531 F.2d 775, 778-79; Response of Carolina v. Leasco Response, Inc., 5 Cir. 1974, 498 F.2d 314, 318-19, cert. denied, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645; Helfenbein v. International Industries, Inc., 8 Cir. 1971, 438 F.2d 1068, 1071-72, cert. denied, 404 U.S. 872, 92 S.Ct. 63, 30 L.Ed.2d 115; Milsen Co. v. Southland Corp., 7 Cir. 1971, 454 F.2d 363, 367-69
 
 
 [6]
 Of course we would be confronted with an entirely different situation if Martin or Ward was before us seeking to enforce the 20% penalty provision for buying outside or trying to cancel a franchise for failing to abide by the tying arrangements. The receipt of valuable goods by the franchisees would not be involved and the franchisor would be enlisting the Court's aid in directly breaching the antitrust laws