# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 13, 2012

No. 10-20719

Lyle W. Cayce
Clerk

FUNERAL CONSUMERS ALLIANCE INC; GLORIA JACCARINO
BENDER; ANTHONY J. JACCARINO; JOHN CLARK; MARIA MAGSARILI;
TONY MAGSARILI; FRANCES H. ROCHA; MARSHA BERGER; SANDRA
GONZALEZ; DEBORAH WINCH; ANNA KAIN; GAY HOLTZ

  Plaintiffs-Appellants

v.

SERVICE CORPORATION INTERNATIONAL; ALDERWOODS GROUP
INC.; HILLENBRAND INDUSTRIES INC.; BATESVILLE CASKET CO.

  Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DENNIS, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN HIGGINSON, Circuit Judge:

Plaintiffs-Appellants, the Funeral Consumers Alliance, Inc. ("FCA") and
eleven consumers ("Consumer Appellants"), brought a class action suit under §
4 of the Clayton Act, 15 U.S.C. § 15, against the largest United States casket
manufacturer, Batesville Casket Company, and its owner Hillenbrand
Industries, Inc. (collectively, "Batesville"); and against the three largest United
States funeral home chains and distributors of Batesville caskets, Service

Corporation International ("SCI"), Alderwoods Group, Inc. ("Alderwoods"),[1] and Stewart Enterprises, Inc ("Stewart").     Plaintiff-Appellants alleged that Defendant-Appellees conspired to foreclose competition from independent casket discounters ("ICDs") who sold caskets directly to consumers at discounted prices and maintained artificially high consumer casket prices in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by engaging in a group boycott to prevent ICDs from selling Batesville caskets and dissuading consumers from purchasing caskets from ICDs. Plaintiff-Appellants also alleged that Defendant-Appellees used concerted efforts to restrict casket price competition, including coordinating prices, limiting the advertisement of pricing, and engaging in sham discounting. Plaintiff-Appellants sought damages to remedy the overpayment for Batesville caskets and sought to enjoin Defendants' allegedly anti-competitive conduct. The district court denied class certification and later, after Plaintiff-Appellants settled their claims with Stewart, dismissed Plaintiff-Appellants' action against the non-settling remaining Defendant-Appellees for lack of subject matter jurisdiction.

For the following reasons, we reverse and remand the dismissal of Plaintiff-Appellants' § 4 claims for lack of subject matter jurisdiction, affirm the dismissal of Consumer Appellants' and FCA's action for injunctive relief for lack of subject matter jurisdiction, and affirm the denial of class certification.

## FACTS AND PROCEEDING

FCA is a non-profit consumer rights organization devoted to advocating consumers' right to choose a meaningful, dignified, and affordable funeral that claims 400,000 individuals as members of its national organization or its local

---

[1] Service Corporation International and Alderwoods Group, Inc. merged several years after the lawsuit was filed but before the present appeal.

affiliates.  Consumer Appellants are eleven individuals who each purchased a Batesville casket from SCI, Alderwoods, or Stewart.  No ICD is a party to this matter.

On November 24, 2008, Magistrate Judge Calvin Botley recommended that the Plaintiffs' Motion for Class Certification be denied in a 30-page Memorandum and Recommendation ("M&R").  On December 29, 2008, Plaintiffs filed objections to the M&R, attaching two additional expert reports from Dr. Gregory Vistnes.

On March 26, 2009, United States District Judge Kenneth Hoyt adopted the M&R denying class certification.

Following the denial of class certification, Plaintiffs settled their claims against Stewart on June 15, 2010 (the "Stewart settlement").  In response, Defendants filed an expedited motion to strike Plaintiffs' jury demand, which was denied by Judge Hoyt on July 13, 2010.  Two days later, Plaintiffs filed an expedited motion to dismiss for lack of subject matter jurisdiction.  After briefing and oral argument on August 2, 2010, the district court granted Plaintiffs' motion on September 27, 2010.  The district court determined that because of the settlement with Stewart, Plaintiffs had lost standing to continue to sue the remaining Defendants.

## DISCUSSION

### A. Subject Matter Jurisdiction

When reviewing a dismissal for lack of subject matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*.  *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005).

Article III standing requires: (1) that Appellants have suffered an injury-in-fact; (2) a causal connection between the injury-in-fact and Appellees' conduct; and (3) that it is likely, not merely speculative, that a favorable decision will

3

redress the injury-in-fact. *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001) (internal citations omitted).

1. Damages claims

The record is clear that Appellants are not seeking compensatory damages beyond those agreed to in the Stewart settlement. Appellants argue, nonetheless, that the Stewart settlement did not cover the attorneys' fees and costs available to them under § 4 of the Clayton Act in this ongoing suit against multiple Defendants other than Stewart. Appellants seek to proceed with this cause of action to prove that the remaining Defendants, Appellees herein, violated federal antitrust laws triggering Appellants' statutory right to attorneys' fees and costs whether or not the Consumer Appellants seek further compensatory damages. The district court held that Appellants did not have standing to recover such attorneys' fees and costs because:

> Here, the consumer plaintiffs alleged overcharges by the defendants in an amount less than $22,000 each. They settled their suit for an amount far greater than each could recover were the case successfully tried to conclusion. Hence, there are no damages that the consumer plaintiffs could recover against the remaining defendant [sic]. And, because the consumer plaintiffs' damages are quantifiable, as evidenced by their settlement, no irreparable injury is articulated even if a Clayton Act violation occurred. . . . The result is that the consumer plaintiffs' claim for actual injury under the Clayton Act is rendered moot by their settlement . . . .

Under our precedent, however, Consumer Appellants have standing to resolve § 4 antitrust claims to decide entitlement to attorneys' fees and costs even if a settlement with one defendant means that no additional compensatory damages will be assessed.

4

The Clayton Act provides any successful plaintiff a mandatory award of costs and attorneys' fees. 15 U.S.C. § 15(a). Section 4 of the Clayton Act states that, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." *Id.*

The plaintiffs have a right under § 4 to sue for the statutorily mandated costs and reasonable attorneys' fees even if a settlement with one defendant means that no additional compensatory damages actually will be recovered. The plaintiffs' right to recover attorneys' fees from the defendants depends on whether the plaintiffs can succeed in "demonstrating that the defendant[s] violated the antitrust laws and can establish the fact of damage." *Sciambra v. Graham News* (*Sciambra II*), 892 F.2d 411, 415 (5th Cir. 1990). The plaintiffs' settlement with one defendant does not prevent them from recovering costs and attorneys' fees to which they may be entitled from the remaining defendants because, by entering into a settlement agreement, "a party releases only those other parties whom he intends to release." *Zenith Radio Corp.*, 395 U.S. at 130–31; *see also Sciambra v. Graham News* (*Sciambra I*), 841 F.2d 651, 656 (5th Cir. 1988). This court has held that plaintiffs have standing under analogous circumstances, "recogniz[ing] that . . . the actual recovery of compensatory damages [is] irrelevant to the recoverability of attorneys' fees," *Sciambra II*, 892 F.2d at 413–17, and this court and other courts have recognized that a plaintiff's right to attorneys' fees under the Clayton Act "is accorded to the injured party, not his counsel." *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 52 (5th Cir. 1976); *accord First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas & Elec. Co.*, 245 F.2d 630, 632 (8th Cir. 1957); *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421

F.2d 61, 88 (1st Cir. 1970). Thus, the plaintiffs have standing to seek costs and reasonable attorneys' fees from the remaining defendants.

We addressed whether actual recovery of compensatory damages is required for a plaintiff to recover attorneys' fees and costs in *Sciambra II*, 892 F.2d at 413–14.[2] As in the present case, the issue before us in *Sciambra II* was whether an antitrust plaintiff was no longer entitled to attorneys' fees and costs after one defendant settled with the plaintiff for an amount greater than the maximum amount of compensatory damages being sought. *Id.* Sciambra brought an antitrust action against Graham News ("Graham") and A.R.A. Services, Inc. ("ARA"). *Id.* at 413. Sciambra settled his claims against Graham but continued his suit against ARA. *Id.* Before trial, the district court held that ARA had abused the discovery process, entered a default judgment against ARA, ordered ARA to pay Sciambra's attorneys' fees and costs, and awarded damages. *Id.* This court rejected the district court's method of calculating damages and remanded on the issue of damages. *Sciambra I*, 841 F.2d at 657–58. On remand, Sciambra conceded that his trebled lost profits were less than the Graham settlement. *Sciambra II*, 892 F.2d at 413. The district court awarded no damages, affirmed its prior award of attorneys' fees and costs from the default

---

[2]Although *Sciambra II* dominated the parties' discussion of this issue in briefing and during the district court's hearing, the district court did not mention *Sciambra II* in its decision. Instead, the district court relied upon the general proposition stated by the Seventh Circuit in *Ortiz v. John O. Butler Co.*, 94 F.3d 1121 (7th Cir. 1996), that, "where a plaintiff has received *all* of the requested relief to which she is legally entitled, there is no longer the requisite case or controversy, and the court is without jurisdiction." 94 F.3d at 1125 (emphasis added). However, Appellants did not receive *all* of the relief they requested in this case; consistent with the Clayton Act, they requested further monetary relief in the form of mandatory attorneys' fees and costs, if an antitrust action against any Defendant is "sustained." Additionally, *Ortiz* did not involve attorneys' fees or the Clayton Act. The Seventh Circuit determined that Ortiz was not "entitled to compensatory damages over and above the lost wages and benefits that were offset by the NLRB settlement" because she waived her arguments by failing to raise them before the district court. *Id.* at 1126.

judgment, and awarded new attorneys' fees and costs for the appeal and the hearing on remand under § 4 of the Clayton Act. *Id.*

ARA claimed that Sciambra could not be awarded attorneys' fees and costs when an earlier settlement offset all compensatory damages. *Id.* at 413–14. We rejected that argument, writing that, "if a plaintiff can prove an antitrust violation and the fact of damage, the plaintiff is entitled to recover attorneys' fees pursuant to section 4." *Id.* at 415. "Our holding merely recognizes that the structure of section 4 and the fact of damage analysis make the actual recovery of compensatory damages irrelevant to the recoverability of attorneys' fees." *Id.* at 415–16. We reiterated that the effect of a settlement on the plaintiff's recovery of compensatory damages has no effect on a plaintiff's right to recover attorneys' fees. *Id.* at 416. This analysis remains persuasive, is consistent with Congress's statutory decision enacting the Clayton Act, and governs our case above all when a settlement, however generous and comprehensive, is with one but not all defendants.

Appellees argue that our holding in *Sciambra II* does not apply to the present case because it is factually distinguishable. The default judgment against Graham News established the existence of an antitrust violation and the fact of damage before the district court determined that the Graham settlement precluded a compensatory damage award. *Id.* Appellees point to a sentence of ours in *Sciambra II* to support their contention that this factual discrepancy distinguishes *Sciambra II* from the present case:

> [i]n a case such as this where, as the previous panel noted, the amount of potential damages was unclear when suit was instituted, . . . an antitrust defendant that causes injury should not be spared liability for attorneys' fees simply because a previous settlement turns out in retrospect to preclude a compensatory damage award.

*Id.* at 416–17. To be sure, unlike *Sciambra II*, antitrust liability has never been

ascertained in this case. The Stewart settlement explicitly stated that no liability was being admitted by Stewart, and no liability determination was made by the district court. The settlement and subsequent stipulated dismissal of plaintiffs' claims against Stewart with prejudice precludes a liability finding, and hence, any further recovery from Stewart. However, as to the remaining Defendants, Appellees herein, *Sciambra II's* logic applies for the narrow, but decisive, reason that no clear amount or allocation of attorneys' fees and costs was assessed.[3] Hence, these Defendants should not be spared liability for such fees if the antitrust charges against them are sustained. The total amount potentially due to the Consumer Appellants remains unclear because the record contains disputed issues of fact as to the amount of attorneys' fees and costs associated with this litigation. Monetary damages under § 4 of the Clayton Act include compensatory damages, attorneys' fees, and costs, not, as Appellees claim, merely compensatory damages.

Again, our reasoning in *Sciambra II* validated Congress's imperative in § 4 for mandatory attorneys' fees and costs. These attorneys' fees and costs are mandatory, Congress decided, in order to encourage individuals to bring suits to enforce the antitrust laws and to discourage potential defendants from violating antitrust laws. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 129 & n.6 (1986) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–31 (1969)); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978); *see also*

---

[3]Indeed, because there has been no determination of liability with respect to the alleged antitrust violation on the part of any Appellees, a decision to the contrary would result in a windfall not negotiated for by any party. Appellees would benefit from a settlement that they had no role in and avoid any determination that they violated antitrust law even though the Stewart settlement explicitly disclaimed resolution for or against antitrust liability even as to Stewart. Further, new consumers with unsettled compensatory damages claims could begin this case anew to determine liability.

*Sciambra II*, 892 F.2d at 416. We explained in *Sciambra II* that, "[b]ecause of the importance of the policy of encouraging private parties to bring antitrust actions, recovery of their reasonable attorney's fees must be sustained regardless of the amount of damages awarded." *Id.* at 417 (quoting *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 412 (2d Cir. 1989)). This right to the mandatory attorneys' fees, when applicable, belongs to the plaintiff, and not the plaintiff's attorney. *See, e.g.*, *Carpa, Inc.*, 536 F.2d at 52 (explaining that a successful plaintiff in a civil antitrust action has the right to a reasonable attorneys' fee that "is accorded to the injured party, not his counsel" and that "the fee recovery [is] plaintiffs' personal right" (citing *First Iowa*, 245 F.2d at 632); *Farmington Dowel Prods. Co.*, 421 F.2d at 88 ("It seems clear to us that . . . the court's award [of attorneys' fees] goes first to the plaintiff as part of *his* recovery in accordance with the language of section 4. If he chooses to pass that money on to his attorneys, that is his business." (emphasis added)); *First Iowa*, 245 F.2d at 632 ("The provisions of the Clayton Act (15 U.S.C.A. § 15) provide[] for recovery of an attorney fee in addition to treble damages but the right accrues to the party injured and not to his attorney." (citations omitted)); *see also* IIA Phillip E. Areeda et al., *Antitrust Law* ¶ 330e, at 46–47 (3d ed. 2007) (explaining that the Clayton Act "makes clear that the plaintiff, not the attorney, is entitled to recover the attorneys' fees and costs"). Additionally, a ruling to the contrary would discourage plaintiffs from making early settlements with some but not all defendants because a settlement could later operate to preclude full recovery of fees and costs pursuant to the Clayton Act. *Gulfstream III Associates v. Gulfstream Aerospace* (*Gulfstream I*), 995 F.2d 414, 419 (3d Cir. 1993) (applying *Sciambra II*). This court and other courts have recognized that another of "the purposes of section 4's attorneys' fees awards" is to "encourage[]

9

private prosecution of antitrust violations by insulating plaintiffs' treble damage recoveries from the expense of legal fees." *Sciambra II*, 892 F.2d at 416 (quoting *Home Placement Serv. v. Providence Journal Co.*, 819 F.2d 1199, 1210 (1st Cir. 1987) (internal quotation marks omitted) (citing *U.S. Football League*, 887 F.2d at 412; *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1312 (9th Cir. 1982)). Appellants made it clear that they would not have settled with Stewart if they had known there was a possibility that the settlement would "have forfeited their right to seek mandatory costs and fees."

The Third Circuit, in addition to highlighting the statutory priority of encouraging private parties to settle, pointed out that, "[a]lthough in almost all cases an award of compensatory damages will accompany an award of Section 4 attorneys' fees, the latter is not dependent upon the former. . . . Any other holding would not only deter the private prosecution of antitrust violations, which is a critical element in the antitrust enforcement scheme and the primary reason attorneys' fees are mandatory under the statute, but could also deter plaintiffs from early settlements with some defendants." *Gulfstream I*, 995 F.2d at 419; *see also id.* ("hold[ing] that the district court did not err in awarding [plaintiffs] attorneys' fees even though the trebled verdict was entirely offset by the prior settlements").[4]

Notably, on remand, Appellants' claims may fail, in which case attorneys'

---

[4]Indeed, even the concurrence observed that if one accepts that "*Sciambra* [was] rightly decided, then it is clear that an antitrust plaintiff can proceed to trial for a determination of liability and a potential fee award, even where prior settlements already have clearly negated any actual receipt of further damages." *Gulfstream III Associates v. Gulfstream Aerospace* (*Gulfstream II*), 995 F.2d 425, 443 (3d Cir. 1993) (Greenberg, J., concurring). Judge Greenberg cited several arguments to support his view, including that: (1) attorneys' fees and costs are mandatory under the Clayton Act; (2) the magnitude of attorneys' fees and costs indicate they are a "crucial component of a plaintiff's recovery" that may exceed the compensatory damages sought; and (3) a trial merely to determine whether to award attorneys' fees and costs will be extremely rare. *Id.* at 442–44.

fees and costs would not be awarded at all.

Appellees cite *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472 (1990), and *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765 (2000). The Supreme Court, in that line of cases, however, clarified the well-settled proposition that plaintiffs cannot sue merely for the "byproducts" of litigation, but neither the Supreme Court, nor courts applying that case law, have extended "byproducts" reasoning to include, indeed preclude, Congressionally mandatory attorneys' fees and costs.

In *Steel Co.*, Citizens for a Better Environment sued Steel Company under the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) for failure to file reports as required under EPCRA. 523 U.S. at 86–88. Under the EPCRA, any damages from an EPCRA violation are awarded to the United States Treasury, not the party bringing suit. *Id.* at 106–07. The statute made it permissible, but not mandatory, for the district court to award "the prevailing or substantially prevailing party" the costs of litigation in a final order. *Id.* at 107 n.8. The Supreme Court determined that the plaintiff did not have standing because the plaintiff was not seeking any relief that would remedy the injury it suffered. *Id.* at 107–10. The Court explained that since Citizens for a Better Environment was not eligible for *any* relief under the EPCRA, they could not bring a suit merely to obtain discretionary attorneys' fees and costs. In contrast, Appellants are eligible for mandatory fees and costs under the Clayton Act if their antitrust claims are proven valid. Again, under § 4 of the Clayton Act, attorneys' fees and costs are not left to the discretion of the judge. They are part of a tripartite award Congress has mandated for plaintiffs to encourage private enforcement of antitrust actions. Attorneys' fees and costs are awarded even if an otherwise successful plaintiff is awarded no compensatory damages by the

11

jury. *Ducote Jax Holdings LLC v. Bradley*, 335 F. App'x 392, 402 (5th Cir. 2009) (unpublished) (citing *Sciambra II*, 892 F.2d at 414–16). The award is mandatory and not limited to merely litigation costs.

In *Lewis*, the plaintiff secured an injunction and declaration that a Florida banking law violated the Commerce Clause and then brought a separate statutory claim for attorneys' fees under 42 U.S.C. § 1988, contending that it had prevailed on its 42 U.S.C. § 1983 claim because the state's prior enforcement of the law deprived the plaintiff of its constitutional rights. 494 U.S. at 474–76. Section 1988 allows courts, again, in their discretion, to grant parties who prevail on certain federal claims to obtain attorneys' fees as part of their costs. The Supreme Court held that the plaintiff was no longer a "prevailing party" and, thus, no longer entitled to attorneys' fees because the underlying § 1983 claim became moot on appeal.[5] *Id.* at 476, 483. Here, the Stewart settlement

---

[5]The Appellees mistakenly rely upon the following language in *Lewis*: "[t]his interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Id.* at 480 (citing *Diamond v. Charles*, 476 U.S. 54, 70–71 (1986)). Both *Lewis* and *Diamond* are distinguishable from our case. Diamond sought to defend the constitutionality of part of an Illinois abortion law based on his personal objection to abortions and his status as a pediatrician and as a parent of an unemancipated minor daughter. 476 U.S. at 56–58. He appealed the Seventh Circuit's grant of a permanent injunction after the State of Illinois chose not to appeal. *Id.* at 61. Because Diamond had no judicially cognizable interest in the statute's defense, the Supreme Court dismissed for want of jurisdiction. *Id.* at 56. The Court held that Diamond did not have standing to appeal simply because the district court had assessed the plaintiffs attorneys' fees against him under § 1988 and he would have to pay those fees unless the State's regulations were reinstated on appeal. *Id.* at 69–70. It was not the case that Diamond "'personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,'" as required by Article III. *Id.* at 70 (internal citations omitted). The Court determined that:

> [a]ny liability for fees is, of course, a consequence of Diamond's decision to intervene, but it cannot fairly be traced to the Illinois Abortion Law. The fee award is wholly unrelated to the subject matter of the litigation, and bears no relation to the statute whose constitutionality is at issue here.

only resulted in the dismissal with prejudice of Appellants' antitrust claims against Stewart, not as against Appellees. Second, the Appellants' entitlement to attorneys' fees is not discretionary if they prevail; it is a statutory mandate. And third, unlike the plaintiff in *Lewis*, Appellants in this case have not yet had assessed and received the full amount that could be due to them under § 4 of the Clayton Act. *See also  Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–13 (1992) ("[A] court does have power to effectuate a partial remedy . . . . The availability of this possible remedy is sufficient to prevent this case from being moot.").

Finally, in *Vermont Agency*, the defendant challenged the standing of a *qui tam* relator to bring suit. 529 U.S. at 771–72. The Supreme Court held that, "[a]n interest unrelated to injury in fact is insufficient to give a plaintiff standing.  The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Id.* at 772–73 (internal citations omitted).  The *qui tam* relator had not suffered an invasion of any right; he was suing on behalf of the United States for a violation of one of its rights. *Id.* at 773. As a result, he was suing for a mere "byproduct" of the suit that would not materialize until the relator prevailed at the end of litigation. *Id.* In the present case, Appellants have alleged that they directly have suffered an invasion of their right to be free from violations of federal antitrust laws. The interest at issue (mandatory attorneys' fees and costs) is related to this injury-in-fact because the plain language and undisputed purpose of the mandatory

---

*Id.* By contrast, Appellants in the instant case allege that they were injured by the "putatively illegal conduct of the defendant."  Attorneys' fees and costs are part of the compensation mandated in § 4 as a result of a defendant's provable violation of federal antitrust laws. Thus, the mandatory fee award is a part of the subject matter of the litigation and must be awarded to every successful plaintiff.

13

attorneys' fees and costs provision (to discourage potential defendants from violating antitrust laws) helps prevent the violation of the legally protected right (the violation of federal antitrust laws). *Sciambra II*, 892 F.2d at 416. Therefore, adhering to the law of this circuit and the Clayton Act, and in the absence of any prior attorneys' fees and costs assessment, Consumer Appellants have standing to proceed to trial against the non-settling Defendants to attempt to prove an antitrust violation. If Consumer Appellants prove a statutory violation, then the trier of fact will determine what attorneys' fees, costs, and any exact compensatory damages amount would be awarded.

2. Injunctive relief

To have standing to sue for injunctive relief, a party must: (1) have suffered an injury-in-fact; (2) establish a causal connection between the injury-in-fact and a complained-against defendant's conduct; (3) show that it is likely, not merely speculative, that a favorable decision will redress the injury-in-fact; and (4) "demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *James*, 254 F.3d at 563 (internal citations omitted); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The threat of injury must be "concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical . . . ." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal citations omitted).[6]

---

[6]Appellants argue the "capable of repetition, yet evading review" doctrine should apply to allow for Article III standing. However, even in the mootness context, "the capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974)). Here, as explained below, none of the eleven individual consumer appellants has made this demonstration.

14

The district court determined Consumer Appellants did not have standing to sue for injunctive relief because they could not "establish an irreparable injury or a future threat." Specifically, the district court concluded that (1) any harm would be reparable by a monetary award, like the Stewart settlement, and (2) based on the particular allegations here, the chance of one of the Consumer Appellants purchasing another Batesville casket or his or her family purchasing a Batesville casket upon the Consumer Appellant's death did not create a "'real' immediate" or potential future injury.

Consumer Appellants did not establish that there was a real and immediate threat that any of the eleven remaining Consumer Appellants will purchase an allegedly overpriced Batesville casket from a SCI or Alderwoods funeral home.[7] In order for the remaining Consumer Appellants to have a future injury, they would have to (1) purchase a Batesville casket that was overpriced and (2) that purchase would have to be from a SCI or Alderwoods funeral home. Batesville makes less than half of the caskets sold in the United States, and SCI and Alderwoods together own and operate less than 10% of funeral homes in the United States. The Consumer Appellants could purchase a non-Batesville casket or purchase a casket from an ICD or from a funeral home not owned by Consumer Appellees when, if ever, they might need to purchase a casket in the

---

[7]Appellants refer to *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 476 F.2d 989 (5th Cir. 1973), and *Supreme Beef Processors, Inc. v. U.S. Dep't of Agric.*, 275 F.3d 432 (5th Cir. 2001), for the proposition that possible or potential harm is sufficient to establish injunctive standing. *Credit Bureau Reports* did not discuss whether a past harm is sufficiently likely to occur in the future to warrant an injunction but instead discussed whether the plaintiff was close enough to entering a market to argue the defendant's monopolization kept the plaintiff from entering. 476 F.2d at 993. In *Supreme Beef Processors*, we decided that the plaintiff could still seek an injunction because it was possible that the defendant would not be forced to close its business after bankruptcy proceedings; if this was not possible, an injunction would have been unnecessary. 275 F.3d at 436–37. The case was mooted during proceedings; standing was not lacking from the outset. *Id.* at 436–38.

future.  Appellants admit that ICDs sell "similar or superior" caskets at lower prices.  Appellants cite no evidence that they specifically sought out a Batesville casket or confined their casket purchase to a SCI or Alderwoods funeral home in the past.

The fact that death is inevitable is not sufficient to establish a real and immediate threat of future harm.[8]  Appellants did not cite any evidence that any of the eleven named individuals are even charged with the task of purchasing a casket for a friend or relative upon his or her passing.  "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Summers*, 555 U.S. at 496 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)); *see also In re N.J. Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012) (holding that consumer plaintiffs failed to establish standing for antitrust injunction claim alleging anti-competitive conduct in the setting of title insurance rates where, inter alia, they did not allege any "plans to buy title insurance in the future, thus failing to raise their claims above the speculative level"); *McCray v. Fid. Nat'l Title Ins. Co.*, 682 F.3d 229, 243–44 (3d Cir. 2012) (reaching the same conclusion where, inter alia, plaintiffs in a similar action likewise had not alleged that they had "'actual or imminent' plans to purchase title insurance"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 14–15 (1st Cir. 2008) (holding that consumer plaintiffs lacked standing to pursue antitrust injunction action alleging anti-competitive action by automobile company defendants where "the

---

[8]Although Appellants contend that one of the Consumer Appellants purchased another casket from SCI after the suit was filed, as the district court held, it is not clear that she purchased a Batesville casket.  Further, this contention was stated by Plaintiff-Appellants' counsel in oral argument for the motion to dismiss, and no substantiating evidence was presented in the record.

complaint [did not] make any allegation regarding a named plaintiff's intention to buy or lease another new vehicle within such a time frame as could be deemed imminent").

3. FCA's associational standing to pursue injunctive relief

It is well-established law that an association has Article III standing to bring a suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The Supreme Court has held that in order to satisfy the first prong of the *Hunt* test, "an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (An "association 'can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right.'")). An organization lacks standing if it fails to adequately "allege[] that there is a threat of [] injury to any individual member of the association" and thus "fail[s] to identify even one individual" member with standing. *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 242 (5th Cir. 1994). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564 (quoting *Lyons*, 461 U.S. at 102) (internal quotation marks omitted). To make this showing when seeking an

injunction, the organization "must show [an individual who] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Nat'l Treasury Employees Union*, 25 F.3d at 242 (quoting *Lyons*, 461 U.S. at 101–02) (internal quotation marks omitted). The Supreme Court has rejected the contention that standing can be established by "accepting the organization's self-description of the activities of its members" and determining that "there is a statistical probability that some of those members are threatened with concrete injury." *Summers*, 555 U.S. at 497.

Appellants alleged in their first amended consolidated class action complaint only that, "FCA's members include consumers that have purchased, or in the future will likely purchase, caskets from funeral homes owned and operated by Stewart, Alderwoods, and SCI." Because Appellants do not allege that there was a real and immediate threat that any of FCA's members will purchase an allegedly overpriced Batesville casket from a SCI or Alderwoods funeral home, FCA lacks injunctive standing on behalf of its members.[9]

---

[9]If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that it has "indicia of membership": its members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs. *Hunt*, 432 U.S. at 344–45. The organization must represent the individuals it claims as members and provide "the means by which [those individuals] express their collective views and protect their collective interests." *Id.* at 345. Appellees argue that FCA does not have standing to pursue injunctive relief because FCA does not have any members. We do not determine whether FCA has members as defined by *Hunt* because even assuming the FCA has members, the FCA has not, on the record before us, met the first prong of the *Hunt* test. *Compare id.* at 344–45, *with Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997), and *Assoc. for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994).

B. Class Certification Denial[10]

We review a denial of class certification for abuse of discretion and legal questions implicated by that decision are reviewed *de novo. Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 227 (5th Cir. 2009) (per curiam); *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004). "'The district court maintains great discretion in certifying and managing an action.'" *Vizena*, 360 F.3d at 502 (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 478 (5th Cir. 2001)).

The requirements for certifying a class action are set forth in Fed. R. Civ. P. 23. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Maldonado v. Ochsner Clinic Foun.*, 493 F.3d 521, 523 (5th Cir. 2007).[11]

Appellants contest the district court's findings that they failed to meet

---

[10]Because the district court erred in dismissing Appellants' claims for lack of subject matter jurisdiction, it is undisputed that we have jurisdiction to review the district court's denial of class certification.

[11]Fed. R. Civ. P. 23(a) states:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(b)(3) states class certification is allowed only if:

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

19

Rule 23(a)(3)'s typicality threshold requirement and Rule 23(b)(3)'s predominance and superiority requirements.[12] Because we find that the district court did not err in holding that Appellants failed to meet Rule 23(b)(3) predominance and superiority requirements, we do not reach Appellants' Rule 23(a)(3) typicality challenge.

1. Scope of Rule 23 analysis

To determine whether class certification is appropriate, courts "must conduct intense factual investigation." *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 420 (5th Cir. 2004). Notably, "there are no hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment." *Id.* at 420–21 (quoting *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003)). Rather, "[t]he unique facts of each case will generally be the determining factor governing certification." *Id.* "The party seeking class certification bears the burden of demonstrating that the requirements of rule 23 have been met." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003) (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998)).

"A district court must rigorously analyze Rule 23's prerequisites before certifying a class." *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308, 310 (5th Cir. 2000) (internal citation omitted). This requires an understanding of "the relevant claims, defenses, facts, and substantive law presented in the case." *Allison*, 151 F.3d at 419 (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)).

Appellants contend the district court's Rule 23 analysis inappropriately

---

[12]Appellants do not contest the district court's denial of Rule 23(b)(2) injunctive class certification in their briefing, so we will not address that issue. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal.").

assessed likelihood of success on the merits. We find, however, that the district court's merits inquiries were appropriate for Rule 23 analysis.

"[C]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (internal quotation marks and citations omitted); *Oscar Privacy Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007), *abrogated on other grounds by Erica P. John Fund, Inc. v. Halliburton Co.*(*Halliburton*), 131 S. Ct. 2179 (2011) (holding that a district court "must give full and independent weight to each Rule 23 requirement, regardless of whether that requirement overlaps with the merits."). Ultimately, the court must consider "how a trial on the merits would be conducted if a class were certified." *Bell Atl.*, 339 F.3d at 302 (internal citations omitted). When there are disputed facts relevant to Rule 23 requirements, overlap with the merits "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Castano*, 84 F.3d at 744 n.17 (quoting *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984)).

Appellants contend that the Supreme Court's June 6, 2011 decision in *Halliburton*, 131 S. Ct. 2179, precludes district courts from rendering merits-based conclusions at the class stage. We disagree. In *Halliburton*, the Supreme Court does not state that merits inquiries or conclusions cannot occur, or must be ignored, in the fact-intensive Rule 23 analysis. Instead, the Supreme Court's holding was specific to the securities fraud context in *Halliburton*. 131 S. Ct. at 2183 (holding that we erred by requiring securities fraud plaintiffs to prove loss

causation in order to obtain class certification).[13]  This distinction, in fact, was expressly stated when the Supreme Court later observed in *Wal-Mart Stores, Inc. v. Dukes* that rigorous Rule 23 analysis frequently will "entail some overlap with the merits of the plaintiff's underlying claim." 131 S. Ct. 2541, 2551–52 (2011) (holding that where proof of commonality necessarily overlapped with the merits contention that defendant had engaged in a pattern or practice of discrimination, inquiry into that merits contention was appropriate for Rule 23 analysis).  The Supreme Court in *Wal-Mart* noted that in *Halliburton*, plaintiffs were required to prove a merits issue (efficient market) at class certification, "an issue they will surely have to prove *again* at trial in order to make out their case on the merits." *Wal-Mart*, 131 S. Ct. at 2552 n.6.

At the same time that Appellants argue that the district court's Rule 23 analysis too rigorously assessed merits issues, they separately contend that the district court's Rule 23 analysis was not rigorous enough and flawed because the district court allegedly ignored the market definition, conspiracy, and class-wide injury opinions of their liability and damages expert, Dr. Vistnes, and failed to review the evidence and issues *de novo*.  To support this contention, Appellants point to "the perfunctory, two-paragraph order adopting" the M&R.  Appellants contend that because the district court's order denying class certification does not list evidence reviewed by the district court, this evidence was not reviewed. We disagree.

First, Dr. Vistnes' reports were included as Exhibits 1 and 2 to Plaintiffs'

---

[13]The Court explained that it had "never mentioned loss causation as a precondition for invoking *Basic*'s rebuttable presumption of reliance," known as the "fraud-on-the-market" theory and that, therefore, securities fraud plaintiffs seeking class certification are only required to prove common questions of law or fact relating to the characteristics of an alleged misrepresentation, not common reliance by all class members on that misrepresentation. *Halliburton*, 131 S. Ct. at 2185–86.

Objections to Judge Botley's Memorandum and Recommendation Denying Class Certification and were filed on December 29, 2008, after the magistrate judge's M&R was filed on November 24, 2008, but well before the district court's March 26, 2009 Order Denying Class Certification. The district court's Order Denying Class Certification states, "[t]he Court has reviewed the plaintiff's objections . . . ." The district court had almost three months to do so, and we find no reason to assume this review did not include the exhibits containing Dr. Vistnes' reports that were filed with Plaintiffs' objections.

Second, on close analysis, Appellants' speculation that Dr. Vistnes' opinions were "ignored" is not supported. A review of the portions of Dr. Vistnes' December 29, 2008 reports cited by Appellants in their briefs and in their objections to the M&R reveals that cited portions of the reports contain little new quantitative analysis and restate facts already covered by Appellants and their expert, Mr. Romaine.[14] Also, the M&R, adopted in full by the district court, refers to portions of Dr. Vistnes' reply report that were reviewed by Magistrate Judge Botley before he issued the M&R, undercutting Appellants' complaint that their expert, Dr. Vistnes, did not have a chance to be heard.

Third, Appellants' contention that the district court erred by not reviewing the evidence and issues *de novo* is unsupported. It is only required that, "'[a] judge of the court shall make a *de novo* determination of those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made.'" *Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983)

---

[14]It is also worth noting that the evidence that Appellants refer to most in their substantive arguments concerning class certification (presumably that which they believe to be most probative) is the Consumer Plaintiffs' Class Certification Post-Hearing Brief, including a table summarizing expert testimony, not the Dr. Vistnes' reports they contend were ignored by the district court.

(quoting 28 U.S.C. § 636(b)(1)).[15] Here, the language of the district court's order denying class certification mirrors the statute: "The Court has reviewed the plaintiffs' objections, the defendants' response to the plaintiffs' objections, as well as made a *de novo* review of the Memorandum and Recommendation and specified findings or recommendations to which objection is made and has otherwise reviewed the Memorandum for plain error."

2. Rule 23(b)(3) predominance and superiority requirement analysis

Rule 23(b)(3) requires a party seeking class certification to "demonstrate 'both (1) that questions common to the class members predominate over questions affecting only individual members, and (2) that class resolution is superior to alternative methods for adjudication of the controversy.'" *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 600 (5th Cir. 2006) (quoting *Bell Atl.*, 339 F.3d at 301). "[T]he predominance and superiority requirements are 'far more demanding'" than Rule 23(a)(2)'s commonality requirement. *Robinson*, 387 F.3d at 421 (quoting *O'Sullivan*, 319 F.3d at 738). The predominance inquiry requires courts "to consider 'how a trial on the merits would be conducted if a class were certified.'" *Bell Atl.*, 339 F.3d at 302 (internal citations omitted). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Halliburton*, 131 S. Ct. at 2184.

In the 30-page M&R adopted by the district court, the magistrate judge correctly began the predominance and superiority analysis by laying out the

---

[15]Appellants' reliance on our decision in *Hernandez* to contend that the district court must have reviewed all the evidence in the case is misplaced. *Hernandez* involved an order from the district court adopting a magistrate judge's M&R that was issued before transcripts of the parts of the class certification hearing that were objected to were available for the district court's review. 711 F.2d at 620. Here, Appellants made no argument that relevant portions of evidence or the record were unavailable to Judge Hoyt at the time he issued his order.

elements of Appellants' claims and what must be shown to prove antitrust liability in a class action context. The magistrate judge continued his Rule 23(b)(3) analysis by finding that Appellants failed to present class-wide proof of the various elements of their private antitrust claims. Ultimately, the magistrate judge concluded that individualized issues affecting each of the roughly one million purported class members nationwide would predominate over common ones, given the lack of a national market or a nationwide conspiracy.

Appellants contend that they should not have been required to prove national market or nationwide conspiracy at the class certification stage because these are not required elements of their antitrust claims. Recovery under § 4 of the Clayton Act, however, requires proof of antitrust impact, which in turn requires proof of the relevant market. *Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 328 (5th Cir. 1978) ("we do not understand how the plaintiffs can make this proof [of anti-trust impact] without examining the relevant school bus market where each individual plaintiff is located"); *see Heerwagen v. Clear Channel Comms.*, 435 F.3d 219, 229 (2d Cir. 2006) (holding that "a plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market"); *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) (holding that "[e]conomic analysis [in anti-trust context] is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market"). Because Appellants brought this case as a nationwide class action, the recovery they seek under § 4 of the Clayton Act requires that they show the relevant geographic market is national (i.e., that it corresponds with the geographic scope of the proposed class). *See Heerwagen*, 435 F.3d at 229, 235 (affirming denial of certification of national

antitrust plaintiff class in part because relevant markets were local and therefore proof specific to individual class members in different geographic markets would predominate).  Defining the relevant market is also an element of Appellants' § 1 Sherman Act claim. *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).  Finally, Appellants' nationwide conspiracy claim must be proven with common, class-wide evidence for the Rule 23(b)(3) predominance requirement to be satisfied. *Blue Bird*, 573 F.2d at 321 (reversing the district court's grant of class certification because the court was "presently unable to agree" with the district court's conclusion that "proof of national conspiracy is a question common to the class").

The factual determinations pertaining to national market and national conspiracy, detailed in the extensive M&R, were necessary for the district court to decide whether to certify a class for Appellants' antitrust claims.  The M&R analysis applied our well-settled approach set forth in *Blue Bird*, where the district court's certification of a national class was in fact reversed because "neither the products involved nor the purchasers appear to be standardized." 573 F.2d at 322.  In *Blue Bird*, while recognizing that antitrust price-fixing cases are particularly suitable for class action treatment, we determined that plaintiffs failed to prove that common issues of law or fact predominated over individual issues because the proposed national class included different sizes of buyers operating under different conditions in various regions throughout the United States and the products involved, school bus bodies, were marketed under different arrangements at different times. *Id.* at 321–23.

Following our analysis in *Blue Bird*, the M&R here noted that caskets may be sold separately or as part of a bundled package; buyers may purchase caskets either on a "pre-need" basis (before death) or "at-need" basis; consumer casket preferences vary by region, religion, ethnicity, age, and community tradition;

prices vary significantly across geographic markets and even within the same funeral home chain; and caskets are generally sold and marketed locally. Specifically, Appellees' expert, Dr. Sibley, testified "that most consumers shop for caskets locally; ICDs rarely shipped their products out of state; ICDs generally sold and advertised locally; and ICDs did not consider internet prices in setting their own prices." The M&R also noted the differences in marketing arrangements between funeral home defendants ("FHDs"), observing that some FHDs offer package discounts for caskets and funeral services but other do not, that not all locations require the purchase of a casket, and that the package discounts vary among locations. Appellants attempt to distinguish the instant case from *Blue Bird* by contending that we denied class certification in *Blue Bird* because the *Blue Bird* plaintiffs planned "to proceed state by state and prove by varying evidence fifty different price-fixing conspiracies." Here, however, the magistrate judge found Appellants' evidence to be similarly localized, stating that "[p]laintiffs fail to explain how statements made by one association in one area of the country equates to a nationwide conspiracy."

Appellants also rely on *United States v. Grinnell Corp.*, 384 U.S. 563 (1996), to show that "the Supreme Court flatly rejected the argument . . . that localized sales activity defeated [the] key features of national markets." This reliance, however, is misplaced. In *Grinnell*, the Supreme Court affirmed a finding of national market where a company that supplies fire and burglar alarm services had national operations, a national schedule of prices, rates and terms, national contracts, and national agreements with competitors, even though the company could sell its product only to local customers. 384 U.S. at 575–76. In contrast, here the evidence shows that (1) the prices FHDs charged were not national and instead varied considerably by funeral home; (2) each of the FHDs and independent funeral homes have different contracts with Batesville and

with consumers; and (3) that marketing strategies vary greatly among FHDs. *See Heerwagen*, 435 F.3d at 230 (distinguishing *Grinnell* by noting that there was no evidence that *Heerwagen* defendants sold products pursuant to national contracts or marketed products on a national basis).  Furthermore, *Grinnell* is distinguishable from the instant case because the *Grinnell* defendants had near-complete (87%) control of the industry. 384 U.S. at 571.  Here, FHDs own less than 10% of funeral homes in the United States and Batesville sells only 45% of caskets in the United States.  This court has repeatedly followed the *Blue Bird* analysis employed by the magistrate judge in the M&R adopted by the district court. *See Robinson*, 387 F.3d at 419, 422 (reversing a district court's certification of a plaintiff class consisting of millions of consumers who had purchased automobiles in Texas and been charged a Vehicle Inventory Tax); *Bell Atl.*, 339 F.3d at 296, 302–03 (affirming the denial of certification of two plaintiff classes allegedly injured by defendants' refusal to permit passage of caller ID data across its long-distance telephone network).

Appellants contend separately that the district court "ignored" the evidence of national market and nationwide conspiracy presented by their expert.[16]  As endorsed by the district court, the magistrate judge here found, "[Appellees' expert's] opinions to be well-reasoned and supported by concise reliable testimony as to why the correct geographic market is localized and not

---

[16]Similarly, Appellants assert that the district court erroneously rejected and failed adequately to discuss their expert's proffered common methodology for calculating class members' damages.  Appellants do not dispute that a court must find a common methodology for computing class-wide damages in order to certify a class. *Bell Atl.*, 339 F.3d at 304; *Blue Bird*, 573 F.2d at 317; *Piggly Wiggly*, 100 F. App'x at 297 ("The necessity of calculating damages on an individual basis, by itself, can be grounds for not certifying a class.").  However, a district court is not obligated to discuss or accept Appellants' expert's proffered common damages formula. *See Piggly Wiggly*, 100 F. App'x at 299 (affirming a denial of class certification despite the plaintiffs' complaints that the district court failed even to discuss their expert's view that class members' damages could be calculated in a straightforward manner).

nationwide as well as why each claim is not susceptible to class-wide proof. [Appellees' expert] supported his testimony with references to analytical data and other specialized work which he has performed as an economist." (Notably, the testimony of Appellees' expert, Dr. Sibley, at the class certification hearing was extensive, covering over 150 pages of the certification hearing transcript.) In contrast, the magistrate judge found "[Appellants' expert's] opinions [were] based on speculation and guesswork, causing his testimony to be unreliable." The magistrate judge explained that this is why he gave "less weight to [Appellants' expert's] opinions." Most tellingly, the M&R is explicit that Appellants' expert testimony and documentary support were thoroughly considered yet were found to contain "mischaracterizations," "overstatements," as well as "references to surveys created by third-parties with no connection to the Funeral Home Defendants." Regardless, a district court does "not abuse its discretion in failing to give the expert's view more discussion or credence." *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004) (unpublished).

In sum, the district court is given great discretion in certifying a class, and the district court's adoption of the M&R in this case does not amount to an abuse of that discretion.

## CONCLUSION

We REVERSE and REMAND the district court's dismissal for lack of subject matter jurisdiction of the claim for attorneys' fees and costs, AFFIRM the district court's dismissal of Consumer Appellants' and FCA's injunctive relief claims for lack of subject matter jurisdiction, and AFFIRM the district court's denial of class certification.

EDITH BROWN CLEMENT, Circuit Judge, concurring in part and dissenting in part.

Although I agree with the majority holding affirming the district court's denial of class certification, I do not agree we have jurisdiction to reach that issue. Because the plaintiffs have received all they are entitled to, this case is moot with respect to plaintiffs' claims for statutory attorneys' fees. As the majority correctly observes, the plaintiffs also lack standing to pursue injunctive relief. Consequently, I respectfully DISSENT from Section A1 and Section B and CONCUR in Sections A2 and A3.

## STANDARD OF REVIEW

Defendants successfully moved to dismiss in the district court due to a lack of subject-matter jurisdiction. We review the factual findings of the trial court for clear error and the legal conclusions *de novo. MDPhysicians & Assocs. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992). Plaintiffs are "required to prove the existence of subject-matter jurisdiction by a preponderance of the evidence." *Middle S. Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).

## DISCUSSION

The facts and procedural history are unique and complex. Plaintiffs concede that they are no longer seeking damages but are instead seeking only statutory attorneys' fees. At this point in the litigation, three things are abundantly clear. First, the named plaintiffs have received well over their claimed treble damages through the Stewart Settlement. Second, the only thing that can be gained in continuing this litigation is attorneys' fees and costs, which plaintiffs' attorneys admit will not go to the plaintiffs themselves. And third, any trial to award attorneys' fees and costs would only exponentially increase the attorneys' fees in question—with no more awarded to the plaintiffs.

Standing is a constitutional requirement under Article III. *See Fla. Contractors v. Jacksonville,* 508 U.S. 656, 663 (1993). "Mootness is the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980). In other words, a party must have standing at all points in the litigation to continue to litigate the case, or else it becomes moot. To have Article III standing a plaintiff must show an "injury in fact" and "must have a personal stake in the outcome." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (internal quotation marks omitted). To avoid mootness, the plaintiffs' personal stake must continue throughout the litigation. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524-25 (5th Cir. 2008).

Here, plaintiffs cannot demonstrate any personal stake in the continuance of the litigation following the Stewart Settlement because they have none. Their claimed damages have been met multiple times over by the Stewart Settlement. The case, as it relates to the plaintiffs, is moot because their injury has been remedied.

The Supreme Court has previously stated that "a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107-08 (1998). The plaintiffs' attorneys' argument for continuing this case for fees is nearly identical to that which was rejected in *Steel Co.,* where the Court ruled that attempting to recoup statutory costs was not enough to confer standing. In that case, the money recovered would have gone to the United States Treasury, whereas here, any further money recovered would go to the attorneys. That distinction is of little merit because the Court has already stated that an "interest in attorney's

31

fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (citing *Diamond v. Charles*, 476 U.S. 54, 70-71 (1986)). To have a case or controversy, "[t]he litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." *Steel Co.,* 523 U.S. at 107. Where "the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements . . . obtained, *solely in order to obtain reimbursement of sunk costs.*" *Lewis*, 494 U.S. at 480 (emphasis added).

Although there is no Supreme Court precedent dealing with this issue in the context of a Clayton Act violation, the plaintiffs bear the burden of demonstrating that the litany of Supreme Court cases on similar statutory costs and attorneys' fees are inapplicable. They fail to do so. Their strongest argument for continuing with this litigation is a misreading of a prior case in this circuit, *Sciambra*, which sat in a markedly different procedural posture from the case now before us. *Sciambra v. Graham News*, 892 F.2d 411 (5th Cir. 1990). *Sciambra* dealt with statutory costs and attorneys' fees under the Clayton Act, but the court had already found antitrust liability against the defendants through a default judgment. Since liability was already established, statutory attorneys' fees were awarded. Despite arguments to the contrary by the plaintiffs and the majority, *Sciambra* is not controlling of the outcome of this case. What the attorneys here request is completely different from *Sciambra* because liability, and the right to be awarded attorneys' fees, has yet to be ascertained. To be clear, the plaintiffs' attorneys are not asking for a hearing to determine the amount of their fees, a perfectly reasonable request. They are

32

asking for a trial to determine liability itself, and therefore any right they may or may not have to be awarded fees in the first place. Unlike in *Sciambra*, here, the attorneys ask to hold a trial that will involve thousands of attorneys' hours, exorbitant costs, and an untold amount of judicial expense, all to determine whether or not the attorneys can get paid more than they have already received—with the result having zero impact on the plaintiffs themselves one way or another.

The majority rests much of its argument on the fact that statutory attorneys' fees are part of the tripartite scheme created by the Clayton Act. While this is certainly a true characterization of the Clayton Act, and would give plaintiffs mandatory attorneys' fees where liability was determined, the majority overlooks the clear limit of any act of Congress including the Clayton Act—the Constitution. Congress cannot confer standing on the plaintiffs and their attorneys outside the bounds of Article III. It is axiomatic that Article III requires that federal courts may only decide actual cases or controversies and the Supreme Court has clearly established that attorneys' fees—a byproduct of litigation—are "insufficient to create an Article III case or controversy." *Lewis*, 494 U.S. at 480. If the majority is right, and the Clayton Act requires a trial to determine liability in order to award statutory fees, then as applied, the Act is unconstitutional because it exceeds Congress' power. The plaintiffs have no personal stake in the outcome of this litigation. The case filed on plaintiffs' behalf  is moot and the plaintiffs' attorneys have no independent standing to continue the suit. Any attempt to confer such standing on them exceeds the constitutional limits set by Article III.

Unable to point to one Supreme Court case that supports this request for a trial solely for attorneys' fees, and therefore not able to meet their burden to demonstrate jurisdiction by a preponderance of the evidence, the plaintiffs'

33

attorneys rest their argument on a warped notion of judicial efficiency under the theory that dismissing this case will deter future settlements. Although such a policy consideration is essentially irrelevant to the constitutional issue of Article III justiciability, the majority adopts this reasoning whole, all while ignoring the multitude of other policy rationales that counsel against letting this suit go forward merely to secure an award of additional attorneys' fees.

The most damning argument against the plaintiffs' theory is that, even after all remedies and recovery have been provided by the settlement to plaintiffs, the plaintiffs' attorneys will continue racking up attorneys' fees for their personal reimbursement all in an effort to find liability and recoup their spent and on-going costs, with nothing more to be gained for their clients. Once removed from the attorney-client relationship, the lawyers could litigate this case unchecked by any responsibility to represent their clients' interests. The attorneys here—devoid of the need to placate their clients' interests or heel at their clients' orders—could litigate this issue unfettered in pursuit of their personal windfall, and could continue to do so long after they have relinquished any meaningful relationship with the plaintiffs. While plaintiffs' attorneys' litigation efforts in the quest for continuous ongoing and reimbursable fees would certainly help deter future anti-competitive actions, it is inconceivable that this is the public benefit scheme intended by the Clayton Act or permitted by the Court's Article III jurisprudence. One could hardly imagine a greater cudgel to be wielded by plaintiffs' attorneys to force unmeritorious settlements than the threat of never-ending litigation by attorneys seeking attorneys' fees for litigating a case about attorneys' fees.

## CONCLUSION

The majority takes great pains to try to distinguish Supreme Court precedent. To get around the clear parallels between this case and that

34

precedent, the majority states in conclusory fashion that this case is different because "the Stewart Settlement only mooted Appellant's antitrust claims against Stewart, not as against appellees." Yet the mootness of this appeal, *in toto*, is exactly the issue before the court and one that the majority glosses over. Because the plaintiffs have no further "personal stake in the outcome" of this case and their attorneys are seeking a trial merely for their own self-interested "byproducts" of litigation, the Constitution and Supreme Court precedent clearly indicate that this case is moot. I respectfully DISSENT.